CHASE, *et al. v.* M'DONALD & RIDGELY.—June, 1826.

Where A had mortgaged to N certain property to indemnify him against any liability for his endorsements of sundry promissory notes, to be drawn by S in favour of T, and by him endorsed to N, not exceeding $10,000, to be negotiated for the accommodation of S and T, and such notes were so drawn, endorsed and negotiated; and N afterwards became the endorser of other notes, drawn and endorsed by S and T, for other sums of money, and negotiated for their use; and A had by deed transferred to S and T the property thus mortgaged to N, and T had conveyed to R, in trust for the benefit of certain of his creditors, his moiety of the property so conveyed to him—*Held,* that the moiety of T in the property conveyed to him by A, could not be made responsible for more than the sum of $10,000, secured by the mortgage from A to N; and the doctrine of *tacking* could not be brought to bear on the case.

As against a surety the contract cannot be carried beyond the strict letter of it—it cannot be extended by equitable construction.

But as S mortgaged to N his part of the property conveyed to him by A, which had been included in the mortgage from A to N, and also other property, to secure N for his endorsements, therefore, as respects S, he by express contract made his property liable beyond the sum expressed in the mortgage from A to N.

As the evidence showed that N did not incur his further responsibility upon the immediate credit of the land mortgaged to him by A, the doctrine of tacking cannot prevail.

If the bill had been filed by N against T, as mortgagor, to foreclose the mortgage, he could not have a right to tack his claim to the prejudice of other creditors.

There is a distinction between a bill to redeem, and a bill to foreclose a mortgage; in the latter case the mortgagee cannot insist on tacking his subsequent debt, as he may do on a bill for a redemption.

The rules which have been adopted in *England,* in relation to pleas in bar to bills in equity, when resorted to by defendants, are considered as applicable to them here; and where the defendant's plea was not set down for hearing, and no replication was filed to it—*Held,* that the plea did not operate as a bar to the complainant's suit.

In the mortgage from A to N, before mentioned, it is recited that S and T were about to obtain a loan of $10,000 at the *Union Bank*, on notes to be drawn by S in favour of T, and by him endorsed to N, and to be renewed from time to time, &c. That A had agreed to secure the payment of the notes, and to indemnify N for the endorsements of the said notes, or any of them. For which purpose A conveyed certain property to N in fee, with a proviso, that if A, S and T, or either of them, should at all times save harmless N, by reason of any endorsement made by him of the notes of S, not exceeding $10,000, the deed was to be void. The loan was negotiated at the *Union Bank*, and the notes renewed from time to time, drawn and endorsed as above mentioned, until they were afterwards paid by proceeds of a loan obtained upon other notes, drawn and endorsed in like manner, at the *City Bank*—*Held*, that as the debt due at the *Union Bank* was closed by funds obtained from the *City Bank*, the mortgage from A to N remained as a security to indemnify N against any liability for his endorsements of the last mentioned notes.

APPEAL from the Court of Chancery. The complainants in the court below, (now appellees,) filed their bill on the 28th of June 1821, against *Samuel, Thomas, Richard M.* and *Jeremiah T. Chase,* and *The Farmers' Bank of Maryland, The City Bank of Baltimore,* and *T. Lytle.* As the facts in the case are sufficiently stated in the decree of the Chancellor, before whom the cause was fully argued, it is unnecessary to state them here.

JOHNSON, Chancellor, (July Term 1823.) The complainants filed their bill to obtain a decree for the sale of the property included in two deeds, the first, executed by *S. Chase,* the elder, the father of *S.* and *T. Chase,* two of the defendants, bearing date the 21st of October 1809, duly acknowledged and recorded, to *N. G. Ridgely,* one of the complainants; the other a deed from *S. Chase,* the younger, to *M'Donald* and *Ridgely,* the complainants, in their copartnership capacity, and to *N. G. Ridgely,* individually. The object of the first deed was to indemnify *N. G Ridgely,* who was about to become the endorser of certain notes to be drawn by *S. Chase* in favour of *T. Chase,* to be by him first endorsed, and then by *Ridgely,* and to be discounted at the *Union Bank.* The deed recites, that "whereas *Samuel Chase,* the younger, and *Thomas Chase,* of Baltimore, sons of *Samuel Chase,* the elder, are about to obtain a loan of ten thousand dollars from the *Union Bank of Maryland,* in notes drawn by *Samuel*

*Chase*, the younger, payable sixty days after date to the said *Thomas Chase*, and endorsed by said *Thomas Chase* and the said *Nicholas G. Ridgely*, which said notes are to be *renewed* from time to time as the same become due. And whereas he, the said *Samuel Chase*, the elder, hath agreed to secure the payment of the said notes, and to indemnify the said *Nicholas G. Ridgely* for the endorsement of the said notes, or any of them." The said deed then in due form conveys the property in fee, subject to the following proviso: "that if the said *Samuel Chase*, the elder, *Samuel Chase*, the younger, and *Thomas Chase*, or either of them, their heirs, executors or administrators, shall at all times hereafter save harmless and indemnify the said *Nicholas G. Ridgely*, by reason *of any endorsement* made by him of the notes of the said *Samuel Chase*, the younger, not exceeding the sum of ten thousand dollars," then the conveyance was to cease, and to be null and void. The bill alleges that *N. G. Ridgely*, under the security of the deed, did become endorser of such notes to the amount of $10,000; and that afterwards he became endorser of other notes, drawn by *S. Chase*, junior, in favour of *T. Chase*, and by him endorsed, to the amount of $7,665; all of which said notes were negotiated and discounted by the said *S. Chase* and *T. Chase, partly* with the *President and Directors of the Union Bank of Maryland*, and *partly* with the *President and Directors of the City Bank of Baltimore*, and afterwards the *whole* of the said notes, so drawn and endorsed, were negotiated and discounted at and with the *President, Directors and Company, of the City Bank of Baltimore,* by the said *S.* and *T. Chase.* It is also represented in the bill, that *Alexander M'Donald* and *Nicholas G. Ridgely*, copartners in trade under the firm of *M'Donald* and *Ridgely*, became the endorsers of other notes drawn by *Samuel,* and endorsed by *Thomas Chase,* amounting in the whole to $18,000; and that *S. Chase*, the younger, to indemnify and save them harmless, on the 1st of February 1819, executed to them a deed for a moiety of the *same* property included in the former deed, and also for two lots of ground by the deed particularly described, the same being part of a tract of land called *Elizabeth's Diligence.* This deed recites, that "whereas *Alexander M'Donald* and

*N. G. Ridgely*, trading under the name and firm of *M'Do-nald* and *Ridgely*, *at the request* and for the *use* of said *Sa-muel Chase* and *Thomas Chase*, endorsed sundry promissory notes, drawn by the said *Samuel Chase* in favour of the said *Thomas Chase*, and by him endorsed for the use and accom-modation of the said *Samuel Chase* and *Thomas Chase;*" and also it is recited in the deed, "that the said *Nicholas G. Ridgely*, in his own name, at the like request, and for the use of the said *Samuel Chase* and *Thomas Chase*, has also en-dorsed sundry promissory notes, drawn by the said *Samuel Chase*, in favour of said *Thomas Chase*, and by him endorsed for *their own* use and accommodation; all which said notes have been discounted at the *City Bank of Baltimore*, and have been renewed from time to time." The deed also recites, that *M'Donald* and *Ridgely*, and *N. G. Ridgely*, had agreed to continue to endorse from time to time as the same became due, in consideration of which, and to save harmless and in-demnify them, the deed was executed; the property con-veyed, "to be held in trust to save harmless and indem-nify them, or either of them, from all loss or injury that they, or either of them, may at any time hereafter sustain, or be put to, on account of the endorsements made or to be made." The complainants state that they did endorse several notes drawn by *Samuel*, and endorsed by *Thomas Chase*, amounting to the sum of $18,000, which were negotiated and discounted by *S.* and *T. Chase*, at and with the *President and Directors of the City Bank of Baltimore*, for their own use and accommodation; one of those notes, as the bill declares, was retired and taken up by *M'Donald & Ridgely*, the others, at the filing of the bill, were held by the bank. *S. Chase*, the drawer, and *T. Chase*, the endorser, as the bill declares, failed to pay the interest on the notes at the time of the renew-al, and *N. G. Ridgely* was forced to pay on the notes for $17,665, endorsed by him, to save his commercial credit, as the notes, unless the interest was paid, would have been pro-tested. The amount paid by him up to the 25th of June 1821, was $2,072 64. That *S.* and *T. Chase*, on being request-ed to pay that sum, as well as the accruing interest, declared their inability to do so. That *S.* and *T. Chase*, failed to pay

the interest on the notes for $18,000 endorsed by *M'Donald & Ridgely*, and to prevent a protest, and to preserve their commercial credit, they were compelled to pay to the amount of $2,048 up to the 18th of June 1821, which sum they, *S.* and *T. Chase*, have declared their inability to pay; and that *M'Donald & Ridgely* have taken up and retired one of the notes, a part of the $18,000, the amount of which was $3000, due the 23d of June 1821, and the costs of protest, to wit, $1 74, *S.* and *T. Chase* having declared their inability to pay.    On the 1st of June 1819, as the bill sets forth, *S. Chase*, the younger, conveyed to *T. Chase* the same property included in the deed of the 1st of February preceding, and subject to that deed, to indemnify *Thomas*, as *Samuel's* endorser; and on the 17th of the same June, *T. Chase* conveyed to *Richard M. Chase*, the other moiety of the property included in the mortgage deed of *S. Chase*, the elder, to *N. G. Ridgely*, of the 21st of October 1809, in trust, and with power to *R. M. Chase* to sell the same, and apply the proceeds, first to pay the *The Farmers' Bank of Maryland* $6,600, to pay to himself $5,404 25, and to pay to *Jeremiah T. Chase* the sum of $1,485, with interest, and to hold the residue for the use of *T. Chase*.    On the 4th of October 1819, *S. Chase*, the younger, conveyed to the *City Bank of Baltimore* the same property included in his deed to *M'Donald & Ridgely*, of the 1st of February preceding, subject to the preceding conveyance, to secure to the bank the sum of $8,468, due beyond the two sums of $18,000 and $17,665, for which *M'Donald & Ridgely* in their copartnership capacity, and *N. G. Ridgely* individually, as endorsers, were liable for, or had in part paid by retiring the two notes before mentioned.    *S. Chase*, the elder, by deed duly executed, acknowledged and recorded, on the 18th of June 1811, conveyed to his sons *S.* and *T. Chase*, the same property he had mortgaged to *N. G. Ridgely* on the 21st of October 1809; by this conveyance *the equity of redemption* in the mortgage premises was transferred to them; and *that interest only* could pass from *S.* and *T. Chase*, by the deeds subsequently made by them.    The bill also alleges, that *S. Chase*, the younger, conveyed part of the same property to *Thomas Lytle*.    But the property conveyed to him appears not to be any part of that now in contest, and the bill, as to him, has been dismissed.

By the joint and separate answer of *S.* and *T. Chase,* the mortgage by *S. Chase,* the elder, is admitted; but the defendant, *Samuel,* denies that *Thomas* had any interest therein, or was to have any part thereof, but that the loan was had for his own *sole* and *separate* use and purpose, and was used and laid out by him at his sole discretion, a part thereof being applied by him to the payment of claims and demands against his said father, at his request. The endorsements by *N. G. Ridgely* for the $10,000, and for $7,665, are admitted as *set forth in the bill;* but the notes, as *Samuel* and *Thomas* allege, were discounted for the sole use of *Samuel.* The endorsement by *M'Donald* and *Ridgely* to the amount of $18,000, as *set forth in the bill,* is also admitted, and the deed of the first of February 1819 to indemnify them; but they deny the notes were negotiated and discounted for *their joint* use and accommodation, but were negotiated and discounted for the sole use of *Samuel. Samuel,* in his answer, alleges that he paid the discounts, until on or about the — day of ——, in the year last aforesaid, when he, being unable to pay the said interest or discount as the notes became due, *N. G. Ridgely,* and the complainants, agreed to pay the same for him. The time, to which the discounts were paid by *Samuel,* from the above extract from his answer, is not precisely stated, but as the year 1819 is the year stated in the part of the answer preceding the extract, the words, in the extract in the year last aforesaid, must refer to that period, and ascertain *the year* when he failed to pay. *Samuel,* in his answer, states that he transferred to the complainants three whole shares of stock in the *Baltimore Exchange Company,* two hundred dollars on each share having been paid by him, and that on the 9th of November 1819, he made over, and assigned in writing to them, $1500 per year, payable quarterly, out of the rents growing due on the *Fountain Inn,* after the 1st of April 1820. The conveyances to *T. Chase,* and to the *City Bank,* are also admitted, as well as the deed to *Lytle. S. Chase* also states that he conveyed to *R. M. Chase,* one lot of ground, part of *Elizabeth's Diligence,* in trust for *T. Chase,* and *Matilda* his wife; that this conveyance was known to the complainants at the time he executed the mortgage to them. The time of the conveyance to *R. M. Chase* is not stated,

blanks are left for the month and year, and a reference for the deed is made to the records of *Baltimore* county. The deed itself, nor a copy, was filed with the answer.

Since the argument of the cause a copy of a deed, taken from the records of the court of appeals, and filed the 6th of August 1823, has been presented to me; it purports to convey a lot of ground in the city of *Baltimore*, in consideration of $5, to *Richard M. Chase*, in trust for *Thomas Chase*, of the city of *Baltimore*, and *Matilda Chase*, his wife, for and during their joint lives, and the life of the survivor of them, without impeachment of or for any manner of waste, and after their deaths, in trust for the use and behoof of the right heirs of the said *Thomas Chase*, and *Matilda* his wife, in fee simple. This deed bears date the 30th of August 1817. The lot of ground, included in the deed, may be part of *Elizabeth's Diligence*, and included in the mortgage to *M'Donald & Ridgely*, of the 1st of February 1819, but there is nothing on the face of the deed from whence we must necessarily conclude it to be part of that tract. It may be, and I presume is, the deed referred to in the answer, although it does not correspond to the description there given of it; but be this as it may, it appears foreign from the matter in controversy. The bill takes no notice of this deed, nor does it claim to have it vacated, or the property included in it sold, nor is *Matilda Chase*, who is interested in that deed, a party to this cause, and of course her interest must remain unaffected by any decree which may pass.

*T. Chase*, in his answer, also denies he had any interest in the loans, or was interested except as his brother's endorser, and denies that he ever saw the deed from his father to *N. G. Ridgely* until filed in this cause; and as he had no part or interest in the said sum of $10,000, so obtained by the said *S. Chase*, it would be right that his brother's moiety of the property mortgaged as security therefor, be first sold and applied to this purpose, and in case of its being deficient, then resort to be had to the other property mortgaged by *Samuel*, before recurrence should be had to the moiety of *Thomas*.

The defendants, as to so much of the bill as seeks a sale of the said premises, also answer and plead thereto, and for plea and answer say, that after the execution of the said several and

respective deeds, mentioned and set forth, that these defendants, together with *R. M. Chase,* the other defendant did, at the request and solicitation of the complainants, on or about the 1st of March, 1820, make, execute, acknowledge and deliver, to the complainants, their deed of indenture, whereby the defendants gave to the complainants full and ample power and authority to sell and dispose of the said premises, on the terms and conditions in the said deed mentioned and expressed, and that the complainants did accept of the said deed upon the terms and conditions therein expressed, and that they did cause the deed to be recorded in the land records of *Baltimore* county. A copy of the deed is filed as part of the plea, the original alleged to be in the possession of the complainants.

*Richard M. Chase,* in his answer, admits the execution of the deed of the 17th of June 1819, by *T. Chase,* for the moiety of the property included in the mortgage of *S. Chase,* deceased, to *N. G. Ridgely,* of 1809; he *R. M. Chase* claims and insists, that under the deed to him he is entitled to a *preference* over the complainants, *after the* $10,000 is discharged, which, as he contends, should be raised out of the moiety of *S. Chase,* and his other property, and that the moiety conveyed by *T. Chase,* should not be sold without the consent of *R. M. Chase,* unless *S. Chase's* property should be insufficient to discharge the mortgage, and in such case only so much as will supply such deficiency.

The answers of the three defendants, *Samuel, Thomas,* and *Richard M. Chase,* present all the grounds on which the claim of the complainants is resisted.

In the argument of the case several points were relied on that do not present themselves to the notice of the court by the defences set forth in the answers. Before any attention is bestowed on the points relied on at the argument, it will be necessary to premise a few facts, clearly established by the evidence in the cause.

Unwilling to determine controverted facts, which were susceptible of indisputable proof, after the first argument in the case, an interlocutory decree was passed, in substance as follows: Several important points of law and equity have been raised, on the determination of which the merits of the respective parties will depend. Not only those points

were pressed with great force and earnestness, but the facts existing in the cause were also controverted, and until the facts are established, either by proof or by admissions, it is judged premature to determine on the law and equity of the case, which may vary according as the truth of the case may present itself. If, for example, the original or the subsequent mortgage was paid off, either by *S.* or *T. Chase,* with *their own funds,* not proceeding *directly* or *indirectly* from the complainants, or one of them, surely they can have no claim on the mortgage premises; but it may be otherwise if the funds, that were applied in discharge of the mortgage, were obtained in consequence of their responsibility, and which they, in consequence of their liability, have been since compelled to replace or pay to the bank from whence they were obtained, whether that was the *Union* or the *City Bank.* The auditor, by the interlocutory decree, was directed to state an account from the evidence in the cause, or from such as might be laid before him by the parties, in which account he was directed to make it appear what sum (if any,) is due to the complainants, or either of them, in consequence of money paid by them, or either of them, as the endorsers of the notes of *S. Chase,* and which notes were first endorsed by *T. Chase;* to what bank the same was paid; and whether, if paid to the *City Bank of Baltimore,* the debts there arose to meet notes, and what notes, before discounted at the *Union Bank.* That he should state the sum due at the audit, and the sum due when the present bill was filed.

No other proof was laid before the auditor on the part of the complainants; but evidence was produced to prove the sum due to the *Farmers' Bank of Maryland,* which debt was intended to be secured by the deed of trust to *R. M. Chase,* from *T. Chase,* of the 17th of June 1819. By the evidence of the Teller of the bank, taken before the auditor, it appears that on the 6th of January 1819, a note drawn by *T. Chase* for $6,600, endorsed by *Richard I. Crabb, Samuel Chase* and *Richard M. Chase,* was discounted by the bank, and the proceeds thereof passed to the credit of *T. Chase;* that the note was renewed until the debt amounted to $6,743 09, and on the 10th of November 1819, it was protested; that that debt is due to the *Farmers' Bank.*

By the report of the auditor of the 18th of April 1823, it appears that at the time the present bill was filed, to wit, on the 28th of June 1821, there was due to *M'Donald* and *Ridgely* the sum of $5,169 98, and to *N. G. Ridgely* the sum of $2,190 06; that at the date of the audit there was due *M'Donald* and *Ridgely* on account of monies paid by them as endorsers of notes of *S. Chase,* first endorsed by *T. Chase* to the *City Bank of Baltimore,* the sum of $21,972 27, and to *N. G. Ridgely* individually the sum of $21,988 45, making the aggregate of $43,960 72. The auditor in his report remarks, whether the said notes to the *City Bank* were negotiated to meet notes discounted at the *Union Bank,* does not distinctly appear, although it may be remotely inferred *from the fact* that some of the defendants, and especially *S. Chase, seem* to have considered the mortgage of 1809 as a *subsisting security* to the complainant, *Ridgely,* to the amount of $10,000, after and notwithstanding the payment of his notes to the *Union Bank* in 1813.

The auditor could not have exercised his usual circumspection when the above remarks were made; it is not *S. Chase's seeming* to consider the mortgage of 1809 as subsisting, from whence it is to be inferred that the debt to the *Union Bank* was discharged, by funds obtained from the *City Bank* on the notes of *S. Chase,* endorsed by *T. Chase,* and by the complainants. The complainants in their bill expressly state, that the notes discounted at the *Union Bank* were *all* afterwards negotiated and discounted at the *City Bank;* the defendant, *S. Chase,* in his answer expressly admits that *N. G. Ridgely* did become his endorser to the amount of $10,000, and also that he afterwards further endorsed for him to the amount of $7,665, and that he, *S. Chase,* negotiated and discounted *the said notes as set forth in the said bill of complaint. T. Chase, R. M. Chase,* and *J. T. Chase,* all by their answers recognize and admit the mortgage of 1809 as in full force, and entitled to a preference; and in the deed of the 1st of March 1820, executed by *S. Chase, T. Chase,* and *R. M. Chase,* the existence of the mortgage is admitted, and allowed to be entitled to a preference. Against *that* claim, until the argument of the cause, no one appears ever to have made the least objection. But if the debt to the *Union*

*Bank* had been discharged by *S.* or *T.* *Chase,* or if they entertained a doubt as to their capacity of transferring the claim from the *Union* to the *City Bank,* so as to be secured by the mortgage, such admissions and concessions never would have appeared. The *City Bank* was incorporated by a law which passed on the 31st of December 1812, and *Samuel Chase* is one of the persons appointed commissioners to carry the act into effect, and in all probability was one of the first directors of the bank. By the evidence of *J. Pinkney,* the cashier of the *Union Bank,* his (*S. Chase's*) account was closed on the 20th of July 1813, very shortly after the *City Bank* got into operation; and exclusive of the evidence mentioned, there would be every reason to conclude he would wish to transfer his debt from a bank, over which he had no control, to one in which he could have influence. On the whole, I am perfectly satisfied that the debt to the *Union Bank* was closed by funds obtained from the *City Bank,* on notes drawn and endorsed, as stated in the bill, and that the sums stated by the auditor as due when the bill was filed, was then due, as well as the sums stated to be due to the date of the audit.

It remains to be considered whether the complainants are, on equitable principles, entitled to a decree for the sale of the property, and if entitled to a preference, to what extent. And supposing them justly entitled to relief, are they excluded by the *manner* that the cause has been conducted? In other words, as the complainants failed to set the plea down for argument, must that plea, although the court is satisfied as to its insufficiency to bar the demand for a decree to sell, cause the bill to be dismissed, leaving the parties to the only relief extended to them by the deed of the 1st of March 1820, or *de novo* to enter this court?

In support of the claims of those intended to be benefitted by the deed of trust to *R. M.* *Chase* of the 17th of June 1819, it has been contended, that as by the books of the *Union Bank* the claim against *S. Chase* appeared to be closed, therefore *R. M. Chase* must, although the debt at the *Union Bank* was discharged with the funds of the complainants, be considered as a purchaser without notice. I shall not examine the case with a view to substantiate the knowledge of *R. M. Chase,* as also of

those for whom he held the property in trust, of the nature and extent of the complainants' demand at the time the deed was given to him; for it is perfectly immaterial whether he was apprised of its extent or not.

I lay it down as incontrovertible, that he to whom an equitable interest is passed can never stand in a better situation than the person from whom such interest was obtained. But he who obtains a legal interest may, if his equity is as strong as his competitor, overreach and defeat him. If, therefore, a person is so imprudent as to convey his land, and deliver the possession before he is paid, although he retains an equitable lien on the land for the amount of the purchase money, such lien only remains while the property is in the possession of the vendee, or those claiming voluntarily under him, or those claiming as purchasers under him, with a knowledge of the nonpayment. But the moment the vendee re-sells and conveys to a *bona fide* purchaser, ignorant of the original purchase money not having been paid, his equitable lien immediately vanishes. Not so he who sells lands and obliges himself to convey them, though that obligation can never be enforced by the *vendee*, or *any person* claiming under him, until the whole purchase money is paid—no matter what representations may be made by the first to the second vendee—no *matter* how totally ignorant he may be of the claim of the original vendee, the first vendee can place the second in no other predicament than that in which he himself stood. Books, it is presumed, need not be cited to establish those principles, and if correct, they prostrate any pretensions *R. M. Chase,* or those for whom he holds in trust, can. have on the ground of his being a purchaser *without notice.* In virtue of the deed of 1809 from *S. Chase,* deceased, the *legal* estate in the mortgage premises was and still is in *N. G. Ridgely. S. Chase,* the elder, by his deed to *S.* and *T. Chase,* his sons, could only, and did only, transfer to them the equity of redemption, the legal estate was not under his control, and as the sons only obtained the equity of redemption, nothing more could pass from them. If then the mortgage of 1809 be a subsisting mortgage, susceptible of being enforced in this court, that portion of defence, resting on *R. M. Chase's* want of notice, must fail.

It has been contended that the mortgage of *S. Chase*, the elder, was confined to negotiations at the *Union Bank*, and no claim could be set up under it for any negotiations at the *City Bank*, although the same arose to meet or close the claim of the *Union Bank*. If *S. Chase*, the elder, was now alive, and made a party to this cause, to prevent a decree for the sale of the mortgaged premises to discharge the $10,000 loan, was to set up as his defence, that the object of his mortgage was to confine the negotiations to the *Union Bank*, and that he was ignorant of the transfer to the *City Bank*, I should doubt his success; indeed, my impressions are it would not avail. The mortgage itself appears sufficiently comprehensive to indemnify *N. G. Ridgely* to the extent of $10,000, no matter *where* the notes were discounted, although the deed purports to recite a loan about to be obtained from the *Union Bank*, and how it was to be procured and secured, yet in the proviso of the deed, by which the equity of redemption is created, the language is *more* comprehensive. The property is to remain in the mortgage, unless "*Samuel Chase*, the elder, *Samuel Chase*, the younger, and *Thomas Chase*, or either of them, their heirs, executors or administrators, shall at all times save harmless and indemnify the said *Nicholas G. Ridgely*, by reason of any endorsement made by him of the notes of the said *Samuel Chase*, the younger, not exceeding the said sum of ten thousand dollars."

Although it was much relied on in the argument that the mortgage of 1809 was limited to negotiations at the *Union Bank*, yet no authority was produced to establish the position, that the recital of the deed must confine its operations to such transactions as it recites. I cannot for one moment believe it was the intention of the father to limit the transactions to that bank—there they were to commence, but where closed could be of no importance. He was desirous to restrain them as to the amount—that effected, any paper *N. G. Ridgely* might endorse for *Samuel*, the younger, was to be protected by the deed. The arrangement in the deed was wise and judicious, and such language used as the occasion demanded—nothing less could be expected from those intelligent persons. The father designed to limit the amount of his responsibility—the sons desired an accommodation, a continuing one, the *duration* of which was

then unknown. Their views might have been speedily frustrated by the refusal of the *Union Bank* to continue the accommodation—the funds received on the loan might have been used in the contemplated speculation, and unless the notes at that bank could be met by funds arising from other notes discounted at another bank, ruinous consequences might have followed. To meet, therefore, any crisis that might arise, the endorser, *N. G. Ridgely,* is to be indemnified for any notes confined to the limits of $10,000, he might endorse for *Samuel Chase.* But if *S. Chase,* the elder, supposing that his mortgage could not be responsible for any debts, except on notes negotiated at the *Union Bank,* had assented to *N. G. Ridgely's* endorsing other notes to be discounted at another bank, could he be permitted to redeem without first discharging those notes, and thereby exonerate the endorser? What could defeat his responsibility, thus voluntarily incurred for the benefit of his sons—drawing in with it the liability of the endorser he had originally contracted to indemnify?

The cause under consideration cannot be more favourable to those claiming under the deed of the 17th of June 1819, than would be that of *S. Chase,* the elder, supposing him to have admitted and consented to a change from the *Union* to the *City Bank.* For *S.* and *T. Chase,* his gratuitous grantees, under his deed to them of 1811, did consent to the change, as is demonstrated by the retiring of the notes at the *Union Bank,* and the revival of them at the *City Bank.*

There is another point of view in which this cause may be considered. It is a principle, firmly established in equity, that a surety who discharges a debt is entitled to all the indemnities and securities that the original creditor possessed. The payment to him by the security is not considered a discharge of the debt, but as a consideration on account of which the claim is transferred to the security. If, therefore, the mortgage of 1809 had been given to the *Union Bank,* and not to *N. G. Ridgely,* without a formal assignment of that mortgage, equity would give him the benefit of it; and surely, if a court of equity would give him the benefit of the mortgage given to the bank, it will not deprive him of one given to himself.

Let us now suppose that *S. Chase* the younger, or *S.* and

*T. C*hase had the legal estate in the property included in the deed of 1809, and that they had executed that deed to *N. G. Ridgely*, and that *M'Donald* and *Ridgely* had gone on to make themselves, as the securities of the *C*hases, responsible to a larger amount, can it be questioned but that the mortgagors would be compelled, not only to pay the $10,000, the immediate object of that deed, but to exonerate the mortgagees from all other engagements for which they, *M'Donald* and *Ridgely*, were responsible as the endorsers of the *C*hases? Need books be produced to establish that a mortgagor, as between him and the mortgagee, must not only pay the debt expressly secured by the mortgage, but all other debts he owes the mortgagee. It appears to me, from the evidence in this case, to be clearly proved, that on the 1st of February 1819, *M'Donald* and *Ridgely*, as endorsers, were responsible for the *C*hases to the amount of $18,000, and *N. G. Ridgely*, individually, to $17,665; at that time no other person, who is a party in this cause, had an interest in the premises, except *S.* and *T. C*hase, under their father's deed of 1811, and *N. G. Ridgely* under the deed of 1809, and on that day *S. C*hase conveyed as additional indemnity the property described in his deed.

A third mortgagee who advances his money, ignorant of a second, has a right, if he can, to obtain a transfer of the first to himself, to unite them, and resist the claim of the second. If so, surely the first mortgagee can claim the benefit of the mortgage to secure subsequent advances; for he who has the *legal* title and *equal equity*, must prevail. The equitable title of the complainants, originating long before that of those claiming under the deed of the 17th of June 1819, blended with the legal title in one of the complainants, must be preferred. Particular reference, in support of the principles laid down, was deemed unnecessary; but those who may desire to see authorities in their support, are referred to *Powell on Contracts, chap.* 7, and to the cases there referred to, and to 2 *Fonbl. B.* 3, *ch.* 3. That the surety who pays the debt is entitled to stand in the situation of the creditor, and entitled to all securities by which the debt was assured, they are referred to *Kaime's Principles of Equity*, B. 1, *ch.* 3, *s.* 1, and to the

decisions of the court of appeals of this state in the cases of *Ghiselin vs. Fergusson,* 4 *Harr. & Johns.* 522, and of *Sotheron's Lessee vs. Reed, Ibid* 307.

From the view taken of the case it appears immaterial whether *T. Chase* was a co-principal in the transaction, or an endorser or mere security; for it is manifest, exclusive of the principle by which a first endorser must be responsible to the second, that in this transaction, in its original commencement, he was to stand responsible to the subsequent endorser. I shall not, therefore, go into the unpleasant inquiry of determining that he was responsible on the ground of having been an equal participator in the reception of the money raised by the notes endorsed by him and the complainants.

It appears from the evidence, that before the deed of the 1st of March 1820 was executed, an offer had been made by the *Baltimore Improving Company* to purchase the property known by the name of *Chase's Wharf,* which had been rejected by the *Chases;* and that so far from their being able to save harmless and indemnify their endorsers, or to free their minds from the dread of their heavy responsibility, that it was not in their power to pay the discounts. The complainants were forced to pay the discounts, and to retain on themselves their responsibility for the principal, they became extremely solicitous to obtain counter-security other than what they had received, and that effected, as no means of an immediate plan presented itself by which they were effectually to be extricated, they were willing, or rather consented, to remain the endorsers. But to obtain that counter-security, the complainants solicitously appealed to the *Chases,* from whom they received promises of doing all in their power. Various projects were made by which they were not only to be indemnified ultimately, but freed from the dread of an immediate call by the *City Bank,* either for the whole or partial payments, until the funds of the *Chases* should be productive; ultimately the whole terminated in the deed of the 1st March 1820. And if the complainants are to be restricted to that deed, and the principles laid down in this decree, to wit, their right to avail themselves of the mortgage of 1809, to cover not only the $10,000, but all their subsequent engagements, then, so far from receiving additional

counter-security to that which they had, if the moiety of *T. Chase*, in the mortgaged premises, extended to the whole of the endorsements, so far from the deed of 1820 being an additional security, it reduced that which they had $15,000. This deed, when sent to the complainants, who most evidently were not apprised of their rights under the deed of 1809, to secure themselves from the pressing demands of the *City Bank*, and to obtain time, they were desirous should be sanctioned by that institution; but on consideration the bank rejected it, and thereby left the complainants in their former predicament, bound to meet the discounts, and ultimately the whole claim. On that deed reliance is now placed by the defendants to defeat the bill; and whether the deed of itself ought to bar the demand, and close all claim on the part of the complainants under the deed of 1809, justly and equitably, if correctly brought before the court, is deemed not material, because, as is contended, it is now before the court in that *form* in which *its merits* are of no importance, provided the facts set forth in the plea, through which it presents itself to the court, are established, and this because the *complainants failed* to set the plea down for argument, but *replied* to the same, and thereby placed the *fact of its* truth, and not its merits, to the attention of the court.

As then it appears to the court that the complainants, exclusive of the deed of the 1st of March 1820, are entitled to relief, the only subjects remaining for consideration are, is that deed of itself a bar, or has the manner in which it has been brought to the court's attention been such as must cause the bill to be dismissed?

A plea in equity is a special matter pleaded by a defendant to a bill, or to some part thereof, shewing and relying on *one* or *more* facts set forth in the plea, as a cause why the plaintiff should not be relieved; it is nothing *more* than a *special answer*, shewing or relying on one or more things why the suit should either be dismissed or barred. 1 *Harrison's Cha. Pr.* 218. From the above definition it appears, that in substance a *plea* and a *special answer* is the same thing; and one would conclude they would be treated in conducting and determining the cause *alike*. But it is contended, that the authorities prove that by *replying to a plea*, and not causing it to be set down to

be argued, its sufficiency is admitted, and if proved to be true, the bill must be dismissed, notwithstanding the court should be of the opinion that the matter relied on in the plea ought not to bar the claim, or cause the bill to be dismissed. I am inclined to believe this is the first time in this state, where an attempt has been made to dismiss a bill by a plea defective in itself, and presenting to the court no legal or equitable defence. I am not apprised of the present practice in the court of chancery of *England*, but the cases from which the modern compilers have deduced the rules found in *Mitford, Maddox* and *Newland's Addition of Harrison's Chancery*, are not of modern date, and the reasons given for dismissing a bill on a defective plea, because it was replied to, are by no means satisfactory, and the authorities in regard to pleas are variant. According to *Harrison's Practice*, a plea may rely on *one* or *more facts*; according to *Mitford* "the defence proper for a plea is such as reduces the cause, or some part of it, to a *single point*, and from thence creates a bar to the suit." *Mitford*, 177. The same book, 198, lays down the following position: "If the plaintiff sets down the plea to be argued, he *admits the truth* of the plea." The authority referred to by *Mitford* for the position, is *Urlin vs.* ——, 1 *Vernon*, 332, determined in the year 1685. In that case the defendant plead, "that the plaintiff brought a former suit for the same matters, which suit is still dependant for *aught he knows to the contrary*." It seems, that the *defendant* in that cause set the plea down to be argued, and on the argument it was, (and according to my judgment correctly,) "insisted that the plea was not good, *because* he does not positively aver that the former suit is still depending, *and no issue can be taken on his knowledge to the contrary*." But the Master of the Rolls allowed the plea; and for what reason? "Because the *defendant* ought not to have set it down to be argued, for by that he admits that the former suit for the same matter is depending." If this is to govern, every defendant, whose plea is *false*, will set it down for argument, and thus establish *its truth*. If then the plaintiff sets the plea down for argument, he admits its *truth*. And in *Mitford* 240, we find another rule; if both of them be correct, the complainants are placed in a serious dilemma. For "if the plea, on argument,

is held to be *good in law*, or the plaintiff admits it to be so *by* replying to it, the *truth* of the plea is the only subject in question remaining; and if the defendant proves the truth of the matter pleaded, the suit, so far as the plea extends, is barred, *even although the plea is not good either in point of form or substance.* *Mitford*, 241. Those, therefore, who conduct the defences by *pleas*, and not by *answers*, must have one point yielded to them, either the *law* or the *fact;* for if you think proper to call in question the lawfulness of the plea, you must set it down for argument, and thereby admit its truth; if you are disposed to question the truth of the facts, you must first make up your mind to yield the point of law. But if the same matters were relied on as a defence in an answer, the defendant would have first to prove their truth, before their effect would be taken into consideration. And the reason given for those most extraordinary positions is, "because by having the judgment of the court upon that point, the parties are saved the expense of an examination." But the plea must be confined to "*a single point;*" for "it would be highly improper that the court should first give judgment upon the circumstances, and that an examination should come afterwards." *Harrison's Ch. Pr* 218. *Chapman vs. Turner*, 1 *Atk.* 54. Notwithstanding the justly exalted character of the person whose reasons are above stated, no less a man than Lord *Hardwicke*, yet to me they are far from being satisfactory.

To me it seems as highly improper for the court first to give judgment on one *point* as on *several, until the fact* or facts were established on which the point or points arose. Again, how is expense to be saved? For it seems "even after the argument of the plea, and allowance thereof by the court, the plaintiff may, by filing a replication to the plea, oblige the defendant to prove its truth." 2 *Maddox*, 236. So far from any expense being saved by an argument on the plea, before the facts set forth are established, additional expense must be incurred. First, on the argument of the law; and secondly, of the facts; and if they are proved not to be true, the court has been called on to determine a case not before them. If I was perfectly satisfied that the facts stated in the plea in the cause under consideration were true, yet, as in my judgment

they constitute no legal or equitable defence, I should feel my-self bound to overrule the plea, notwithstanding the complai-nants had replied to it. But in this cause it will be found no replication ever was entered. I agree with the present dispo-sition of *English* courts of chancery, as communicated by *Mitford*, 181, "there is little disposition in the courts of equity to countenance *those defences* which tend to prevent the pro-gress of a suit to a hearing in the ordinary way, whatever the expense of the proceeding may be."

The defendants, *S.* and *T. Chase*, filed their answers on the 6th of December 1821, and on the 15th of the same month a commission to take the evidence *issued by consent.* If it was competent for the defendants to defeat the present bill on ac-count of the complainants' replying to their plea; yet as no re-plication appears in the cause, either by the papers or the docket entries, that part of the defence, much relied on at the trial, is removed.

On the whole, being satisfied of the great justice and equity of the complainants, and that they are entitled to relief—*De-creed*, that unless the defendants shall, on or before the nine-teenth day of April next, pay to the complainants, or bring into this court to be paid to them, the sum of $43,960 70, with interest from the 18th of April last on $35,665, (a part thereof,) until paid, together with the costs of this suit, that the property included in the mortgage from *Samuel Chase*, deceased, to *Nicholas G. Ridgely*, one of the complainants, bearing date the 21st of October 1809, and the property also included in a deed from *Samuel Chase*, one of the defendants, to the complainants, bearing date the 1st of February 1819, except such part of the property included in the last deed that was conveyed by the said *Samuel Chase* to *Richard M. Chase*, one of the defendants, in trust, by a deed bearing date the 30th of August 1817, shall be sold. That *Samuel Moale*, be and he is hereby appointed trustee to make the said sale, &c. From this decree the defendants appealed to this Court.

The cause was argued at the last June term before BUCHA-NAN, Ch. J. and EARLE, MARTIN, STEPHEN, and ARCHER, J.

*Wirt*, (Attorney General of *U. S.*) *Magruder*, and *Mayer*,

for the Appellants. The complainants, (the now appellees,) charge that they became endorsers for *S. Chase,* junior, of promissory notes to a large amount, which were negotiated in the *Union Bank of Maryland* and *City Bank of Baltimore;* that some of these notes they have actually paid, and the rest they will be compelled to pay. They pray a sale of the land mentioned in the deed from *S. Chase,* senior, to *N. G. Ridgely,* dated the 21st of October 1809; and they claim that by virtue of that deed, the land thereby conveyed is answerable, as well to *M'Donald* and *Ridgely* as to *N. G. Ridgely,* for the amount of the endorsements by them; and that they are entitled to be preferred to the creditors of *T. Chase,* in the distribution of the proceeds of the sale of his portion of the land. The different defendants take different grounds of defence. *S.* and *T. Chase* by plea set forth the deed of the 1st of March 1820, and insist that that deed is a bar to the relief sought of them. *J. T. Chase* and *R. M. Chase,* creditors of *T. Chase,* insist that his portion of the land ought not to be sold for the payment of the complainants' claim, until it is ascertained that all the property mortgaged by *S. Chase,* junior, to the complainants, and which is unquestionably answerable for their claims, should prove insufficient. The *Farmers' Bank of Maryland,* another of the creditors of *T. Chase,* and the payment of whose debt was secured by the deed of the 1st of March 1820 to *R. M. Chase,* know nothing of the claims of the complainants, but insist that the claim of the bank is entitled to a preference to any claim the complainants may have upon the estate of *T. Chase.* The *Farmers' Bank* consented to an immediate sale of the premises, leaving the question of preference to be decided after the sale takes place. This was obviously the proper course, because, until it was ascertained that the property of *S. Chase,* junior, would prove insufficient to pay the debts of the complainants, it could not be known that the question of preference was one in which the parties were interested. This course, however, could only be adopted with the consent of all the parties. The other parties insisted that the whole equity of the case should be settled before a sale was decreed, and of course this part of the answer of the *Farmers' Bank* is of no importance.

The chancellor decided the whole equity of the case in favour of the complainants—overruled the plea, and adjudged that the property conveyed by the deed was answerable, as well for the amount of endorsements by *M'Donald* and *Ridgely*, as by *N. G. Ridgely*, and that all of them must be paid before the creditors of *T. Chase* could claim to be paid out of the proceeds of sale of *T. Chase's* part of the land.

Three questions arise in this case.   1. The effect of the plea. 2. The claim of *M'Donald* and *Ridgely*. Is the property conveyed by the deed of *S. Chase*, senior, to be charged with the payment of any part of that claim? 3. Can *N. G. Ridgely* ask a sale of this property to reimburse to him any part of the money which he alleges to have been paid by him?

1. With respect to the plea, it was for the complainants to decide whether they would admit the truth of it, and deny its sufficiency, or admit its sufficiency, and deny its truth. The latter was to be done by a general replication.   If they intended to admit the matters set forth, although true, to be insufficient in law, then they ought to have set down the case for hearing upon the plea.   It is stated in *Mitford*, 240, that if the plea is upon argument held to be good in law, *or the plaintiff admits it to be so by replying to it*, the truth of the plea is the only subject of question remaining, so far as the plea extends.   If the defendant proves the truth of the matter pleaded, the suit, so far as the plea extends, is barred, even though the plea is not good, *either in point of form or substance*.   See also *Cooper's Plead.* 233.   The truth of the matters set forth and relied on in the plea cannot be contested. If then the complainants did not choose to take the judgment of the court upon the sufficiency of the plea, but has in truth admitted its sufficiency, and put in issue the truth of the matters contained in it, then "the suit, so far as the plea extends, is barred."   In the court below, it was considered that the complainants had put in issue the truth of the matter in the plea.   A commission had been issued to take testimony, which of course was irregular, until a general replication was put in. It was discovered, however, by the chancellor, after the argument, that the complainants had omitted to put in any general replication.   Of course, as the case had not been set down for

hearing on bill and answer, there was no case ready for decree. The error being discovered at that time, and before any decree was pronounced, the course to have been taken is pointed out in the books of practice. "Where by mistake, (says *Mitford*, 257,) a replication has not been filed, and yet witnesses have been examined, the court has permitted the replication to be filed *nunc pro tunc.*" This might have been done in the court below, and then the only question upon the plea was as to the truth of it; but it was not done, and then the parties were not at issue. Nothing set forth in any of the answers was admitted, or denied, and this cause was in the situation of a suit at law, in which the defendant has pleaded, and the plaintiff has yet to decide whether he will take issue upon the truth or sufficiency of the matter pleaded—whether he will *reply* or *demur*. The error on the part of the complainants not having been corrected, after the argument, as it might have been *nunc pro tunc*, the question is, can it be corrected in this court? Can this court permit the replication to be filed *nunc pro tunc?* This is a question in which the defendants can feel no interest. *Quacunque via data*, the law is with them. If the replication is received now, then it admits the sufficiency of the plea, if the matters pleaded be true, and the truth of them is incontestible. Of course the chancellor erred in overruling the plea, instead of decreeing that "the suit, so far as the plea extends, is barred," as all the authorities explicitly tell us. If on the other hand a replication cannot be received in this court, *nunc pro tunc*, then, most obviously, the case before the court is one which has never been ready for hearing. The complainants, who alone could do it, have never put the cause at issue; and this being the case, is it a question which in a court of *dernier resort* it would be respectful to argue, whether a decree in favour of the complainants, pronounced in a cause before the parties are at issue in that cause, can be affirmed?

2. It seems that *M'Donald* and *Ridgely* also endorsed the notes of *S. Chase*, junior, and that *N. G. Ridgely*, of that firm, is the same *N. G. Ridgely* to whom the deed of 1809 was executed by *S. Chase*, senior. The question is, is the property conveyed by *S. Chase*, senior, answerable not only for the whole amount of endorsements by the individual *N. G. Ridge-*

*ly*, but also for the endorsements by the firm of *M'Donald* and *Ridgely*, and this merely because he was a partner of that firm? The decree answers the question in the affirmative, and for the reasons set forth. A particular examination of these reasons is deemed to be unnecessary, because the question itself has been too well and too long settled, now to be deemed *vexata questio.* The complainants, in order to sustain this claim, must treat this deed as a mortgage, and insist that they have a right to *tack* to the mortgage debt, this other debt, because it is due to the mortgagee, as well as to his partner, who is no party to that mortgage. Let it be assumed for the present that the deed of 1809 is a mortgage, and that this second claim, which it is proposed to *tack* to the original debt, was in fact due to the mortgagee himself individually, and (which it certainly is not,) a debt due from the mortgagor, the proposition to be maintained on the part of the complainants in the court below is, that the assignees of the equity of redemption can only redeem the property upon payment of both these claims. How many centuries have gone by since the law of this part of the case was conclusively settled? The defendants are either purchasers or mortgagees of the equity of redemption. The law upon this subject, as it has long been settled, and will be found in all the authorities, is stated by *Cruise*, tit. *Mortgages, ch.* 3, *s.* 27, 28, 34. It is now settled, that a bond (given by mortgagor to mortgagee,) cannot be tacked to a mortgage, even as against the mortgagor, though the heir at law can redeem only by paying both debts. Not against a purchaser or assignee of the equity of redemption, who may redeem without discharging a bond debt due to the mortgagee; because, the lands *in the hands of the alienee* can be charged with nothing but what is an immediate lien thereon, which the bond is not. They referred to *Francis's Maxims*, 2, 7. *Brace vs. Duchess of Marlborough*, 2 *P. Wms.* 491. 1 *Pow. on Mortg.* 391, 398, 399, 400. *Lowthian vs. Hasel*, 3 *Bro Ch. Rep.* 163. *Anonymous*, 3 *Salk.* 84. *Straton vs. Rastall*, 2 *T. R.* 366, 370. *Hayes vs. Ward*, 4 *Johns. Ch. Rep.* 130. It is then the settled law that these premises in the hands of the alienees of the equity of redemption cannot be charged with the payment of the debt due to *M'Donald* and *Ridgely*, nor with the payment

of any debt due to *N. G. Ridgely* individually, other than that which it was the avowed object of the deed to secure. Upon this point the appellants place no reliance on the letters of *N. G. Ridgely* to be found in the record. It is at once admitted that they cannot be used to interpret the contract between him, and *S. Chase,* senior, or to ascertain his rights under the deed. It is by established principles, and rules of construction, not by the opinions, recollections, or forgetfulness of *N. G. Ridgely,* that the question is to be decided.

3. The *third* point is one which will require a more particular consideration. *N. G. Ridgely,* the person to whom the deed of 1809 was executed, has been obliged to pay some notes drawn by *S. Chase,* junior, and which were endorsed by *Ridgely.* Can he resort to this property to reimburse any, and if any, what part of this money? The authorities already cited prove that he cannot claim more than the $10,000, with interest. Can he claim that? These facts are proved in the record, and will not be denied—A few days after the execution of the deed of 1809, the loan, which the deed tells us was then about to be negotiated, was actually negotiated. Notes drawn by *S. Chase,* junior, payable to *T. Chase,* and endorsed by *T. Chase* and *N. G. Ridgely,* amounting to $10,000, were discounted by the *Union Bank of Maryland;* and for the amount of that loan, the payment of the debt then contracted, it will not be contested by us, that this property is answerable. Of that debt $5,000, it is expressly proved, was discharged by *T. Chase,* after (one or the second) renewal. When the other $5,000 were paid, or how paid, it does not appear. But it is in proof that the *Union Bank of Maryland* has now no such claim—that the debt has been discharged there; and it will not be pretended that *N. G. Ridgely* has been called upon by that bank, or any assignee of that bank, to pay one cent of the debt, which the deed of 1809 informs us was then about to be negotiated. On our part it will not be denied, that notes to a large amount drawn by *S. Chase,* junior, and endorsed by *N. G. Ridgely,* were negotiated at the *Union Bank.* All of them, it is in proof, were discharged some ten or twelve years ago, and none of them paid by *N. G. Ridgely.* Again, it is a fact admitted in the case, that *S. Chase,* junior, some years

subsequently to the deed of 1809, became largely indebted to the *City Bank of Baltimore*; that *N. G. Ridgely* was one of the endorsers of his notes. These notes, however, were not payable to *T. Chase*, but to *N. G. Ridgely*. And it is further admitted, that these notes *Ridgely* has been obliged to pay. On the part of the appellees it may be contended, that the debt contracted with the *City Bank*, and the funds thereby obtained, enabled *S. Chase*, junior, to pay off the debt due to the *Union Bank*. With respect to which we have only to say, there are circumstances which may be thought to render this probable, but there is no proof of it. It is at best but *conjecture*. Further, according to our view of the law, it is wholly unimportant whether this be proved or not, there being no proof that *S. Chase*, senior, ever consented that his property should be made answerable for any debt contracted, no matter *when* or *for* what *purpose*, with the *City Bank of Baltimore*. The deed, and nothing but the deed, must explain the meaning of the parties to it. The essential parts, in the discussion of the question, are the recital and the proviso. It is a deed executed by *S. Chase*, senior, to *N. G. Ridgely*, and professes to convey to the latter certain lots in the city of *Baltimore* belonging to the former. For what purpose was it executed? "Whereas *Samuel Chase*, the younger, and *Thomas Chase*, of *Baltimore* county, sons of the said *Samuel Chase*, the elder, are about to obtain a loan of ten thousand dollars from the *Union Bank of Maryland*, on notes drawn by the said *Samuel Chase*, the younger, payable sixty days after date to the said *Thomas Chase* and the said *Nicholas G. Ridgely*, and which said notes are to be renewed from time to time as the same become due. And whereas the said *Samuel Chase*, the elder, hath agreed to secure the payment of the said notes, and to indemnify the said *Nicholas G. Ridgely* for the endorsement of said notes, or any of them." Such is the recital of the deed. It then describes the property to be conveyed by it, and afterwards comes the proviso or condition in these words: "Provided always, and it is the true intent and meaning of these presents, and of the said parties hereunto, that if the said *Samuel Chase*, the elder, *Samuel Chase*, the younger, and *Thomas Chase*, or either of them, their heirs,

executors or administrators, shall at all times hereafter save harmless and indemnify the said *Nicholas G. Ridgely*, by reason of any endorsement made by him of the notes of the said *Samuel Chase*, the younger, not exceeding the said sum of ten thousand dollars, then," &c.    The bill of complaint carefully avoids all notice of the recital in the deed, which shows beyond all question the intent of the parties, and for what debt the elder Mr. *Chase* was willing to make his property responsible.    It may safely be admitted by us, that the expressions of the proviso or condition, *but for the recital*, would have charged this property with the payment of any debt, (not exceeding $10,000,) which *S. Chase*, junior, contracted, even at another time and from another bank.    But the recital confines it to a particular debt.    A debt *then*, not years hence, only then about to be contracted to secure the payment, when it was demanded, of a sum of money which was to be borrowed, not of any person nor yet of any banking institution, but of one bank alone, the *Union Bank of Maryland*, and a debt of $10,000, and no more, which was to be borrowed only of the *Union Bank*, and not upon notes drawn and endorsed, no matter by whom, but "on notes drawn by the said *Samuel Chase*, the younger, payable sixty days after date to said *Thomas Chase*, and endorsed by said *Thomas Chase*, and a certain *Nicholas G. Ridgely*, and which notes are to be renewed from time to time," &c.    It is contended that this deed is an indemnity offered to *N. G. Ridgely*, only to induce him to endorse particular notes, to be negotiated at a particular bank, and that before he can claim a sale of this property by virtue of this deed, in order to repay monies which at any time he may have been obliged to pay for *S. Chase*, junior, he must prove not merely that he has been compelled to pay money for *S. Chase*, junior, but that the money which he was thus compelled to pay, was a part of the very debt spoken of in the deed of 1809—a debt of $10,000 then about to be contracted with the *Union Bank of Maryland*, and to be evidenced by notes drawn by *S. Chase*, junior, sixty days after date to *T. Chase*, and endorsed by *T. Chase* and *N. G. Ridgely*. · If this proposition be sustained by us, *Ridgely* · clearly has no title to relief.    The debt which he claims to have paid was a debt contracted with a bank, not in

existence till years after this debt was contracted, and the notes were drawn payable, not to *T. Chase*, but to *N. G. Ridgely* himself. In 3 *Cruise's Digest*, sect. 8, page 416, *(American edition,)* it is laid down, that where there is a particular recital in a deed, and general words of release are inserted, the generality of the words shall be qualified by the recital. So also 1 *Pow. on Cont.* 390. "The principle is, that the matter in hand is always presumed to be in the mind and thoughts of the speaker, (or writer,) *though his words seem to admit a larger sense,* and therefore *the generality of the words used, shall be restrained by the particular occasion.*" Now if this be the law, as it certainly is, is it possible to misunderstand the meaning of the parties, or to doubt the true construction of this deed? Why is it executed? Because *S. Chase,* junior, and *T. Chase,* are about to borrow money of a particular bank; and because *N. G. Ridgely* is to be one of the endorsers of the notes, which that bank is to discount; and because the elder *S. Chase* has agreed to secure the payment of this debt, and to indemnify *N. G. Ridgely* for the endorsement of the *said* notes, or any of them. This is the avowed and only purpose of the parties to the deed; and when in the proviso it is declared that the deed shall be of no effect if *N. G. Ridgely* should be saved harmless and indemnified by reason of *any* endorsement made by him of *the* notes of *S. Chase,* junior, the law as well as common sense, confine these expressions to the notes spoken of in the recital, to the notes which are then to be negotiated, and the notes which from time to time are to be the renewals. Such was the matter in hand, and such matter only was in the minds and thoughts of the parties. If then the case was *res integra,* one would suppose it was impossible for a rational mind to entertain a doubt upon it. But it has repeatedly, and in different courts, been adjudicated, and the claim of *N. G. Ridgely* is at war with decisions which all courts are bound to respect.

This deed is not a mortgage. The grantor in it is no debtor of *N. G. Ridgely.* But a debt is about to be contracted by a third person—*N. G. Ridgely* may eventually be the creditor of that third person, and the grantor of the deed makes his property, not himself, responsible for the debt. The grantor un-

dertakes to secure, as far as the property conveyed will secure, a particular debt, and he takes especial care to say what debt he does mean to secure.    It is a debt then about to be created—a debt to be due from *S. Chase*, junior, and *T. Chase*, to the *Union Bank*, and which *N. G. Ridgely* may be bound to pay. That debt *N. G. Ridgely* has never been called upon to pay. Every cent of it has been paid, perhaps a part by *S. Chase*, senior—certainly not a cent of it by *N. G. Ridgely*. But *N. G. Ridgely* became surety for another debt, to another creditor, and insists that he is to be indemnified against any loss which he may sustain by reason of his endorsement of other notes, because for the benefit of the same persons. *Arlington vs. Merricke*, 3 *Saund.* 403, was an action of debt upon a bond, which recited that the postmaster general, who was the plaintiff, had deputed a third person to be his deputy postmaster *for six months.*    The condition was for the faithful execution of the office by that third person, *during all the time that he should continue postmaster*.    He was continued more than six months in the office, and for his default made after the six months had expired, the suit was brought against the surety. Now it is utterly impossible that the property conveyed by the deed of 1809 can be answerable, except for the debt then created, and for a debt due to the *Union Bank*, unless the surety was responsible in the case referred to.    The condition here makes him responsible for the faithful execution of the office *during the time* that the deputy remained in the office, and during a part of the time, and after the six months expired, he made default.    Yet the surety was held not to be liable. Why?    The court held, that the *general words of the undertaking were confined to the time mentioned in the recital.* It is utterly impossible to charge the property conveyed by the deed of 1809, and by virtue of that deed, with one cent of the debt due from *S. Chase*, junior, to *N. G. Ridgely*, without overruling the decision of *Arlington vs. Merricke*.    Will the court take upon itself to overrule that decision?    In *England*, in different ages, by all its courts, it has been recognized as good law.    In this country the correctness of it is yet to be questioned. It is in all the books, and by all the judges spoken of as the "leading case upon the subject"—never to be depart-

ed from. The same doctrine had been sanctioned in the previous case of *Horton vs. Day,* 22 *Car.* I, referred to by one of the judges in the argument. *Bartlett vs. Attorney General,* in 1709. *Bowdage vs. Attorney General,* in the same year. So also in a yet stronger case, *Liverpool Water Works vs. Atkinson,* 6 *East,* 507, where the bond in suit recited that the defendant himself had agreed with the plaintiffs to collect their revenues "from time to time *for twelve months;*" and the condition was that he should account *at all times* thereafter, "during the continuance of such his employment, or for so long as he should continue to be employed." The court considered themselves governed by the case of *Arlington vs. Merricke,* and that the general terms of the engagement were restrained by the time mentioned in the recital. See also the case of *Pearsall vs. Summersett,* 4 *Taunt.* 593. The cases of *The Wardens of St. Saviour's Southwark, vs. Bostock,* 5 *Bos. & Pull.* 175. *Hassell & Clark vs. Long,* 2 *Maule & Selw.* 363. *Wright vs. Russell,* 2 *W. Blk. Rep.* 931. S. C. 3 *Wils. Rep.* 532, 539; *and Grant vs. Naylor,* 4 *Cranch,* 224, 234—all of them expressly affirming the doctrine for which we contend. Here the property conveyed is made answerable for one particular debt—for notes carefully described, and *then* (not from time to time,) to be negotiated. It is an undertaking by a third person to secure, as far as the property would secure, the debt of another, and the words of the deed must receive the same construction that would have been given to them if *S. Chase,* senior, had executed a bond containing the same recital and condition. It cannot be said that the cases cited do not apply, because they are decisions at law, and this a case of equity. The rules of construction are the same in courts of law and of equity. The court say, in *Wright vs. Russell,* 3 *Wils.* 539, "courts of equity are favourable to securities; for where they are not strictly bound at law, equity will not bind them." The debt then which *S. Chase,* senior, engaged should not be paid by *N. G. Ridgely,* was a debt due to the *Union Bank of Maryland;* and no such debt has *Ridgely* paid. He has made himself responsible for other debts contracted by the same individual, but those are debts not mentioned in the deed. Treat the deed as a mortgage executed by the debtor himself, and then

the mortgage debt is paid off. Can the mortgagee claim that the mortgaged premises be sold to pay another debt, not provided for in the deed? In *Kirby and others vs. The Duke of Marlborough and Coburn*, 2 *Maule* & *Selw.* 18, it was held, that a bond entered into by the defendants to the plaintiffs, to enable *Coburn* to carry on his trade, conditioned for the payment of all such sums not exceeding £3000, which should at any time thereafter be advanced by the plaintiffs to *Coburn*, was not a continuing guarantee to the extent of £3000 for advances made at any time, but only a guarantee for advances once made to the extent of £3000. So also in *Rogers vs. Warner*, 8 *Johns. Rep.* 92—"If D wishes to take goods of you on credit, we are willing to lend our names as securities *for any amount* he may wish." ' D took goods on credit several times, and paid for them. About 18 months after the letter of credit was dated, he purchased upon credit other goods, for which he did not pay—Decided, that the letter of credit did not extend beyond the first parcel of goods. But it has been asked, what difference did it make to the elder *S. Chase*, with whom the debt was contracted? Perhaps if it were necessary, it could be shown there were many and good reasons why he should insist that the debt, for which he was answerable, should be contracted with the *Union Bank*, and no where else. But it is not necessary to assign a reason for it. *Sic volo, sic jubeo*, is the language of Mr. *Chase*, and *stat pro ratione voluntas*, says the law in this case. He had a right to say to the endorser of these notes—If you wish me to indemnify you, take care of whom the money is borrowed—take care by whom the notes are drawn—to whom payable, and by whom they are endorsed; and take care, too, that the notes thus to be drawn, endorsed and negotiated, do not exceed $10,000. All these directions are disregarded. He endorses notes to a much larger amount. The debt actually contracted at the time is paid off. The money now claimed was money borrowed, it is not known when or for what purpose. All that we learn about it is from *N. G. Ridgely* himself, that he did endorse the paper, because the deed of 1809 had been executed.

*Taney, Moale* and *R. Johnson*, for the Appellees. 1. It is not the practice in our court of chancery to put in a replication

where a commission to take testimony (as in this case,) is issued by consent. Such consent is a waiver of a replication. But if consent is not given by the parties to issue a commission, then, as a mere matter of form, the register puts in the replication, ' and makes up the issue. If the plea is proved to be true, then it is a bar to the action; but the plea in that case must be to the whole of the bill. Here it is not. 2 *Madd. Chan.* 299. The plea not being replied to, the benefit of denial is reserved for final hearing. *Cooper's Plead.* 233, 229. 2 *Com. Dig.* tit. *Chancery,* (I 2,) 274, cites *Abr. Ca.* 41.

2. The notes for $7,665 and for $18,000, can be tacked to the mortgage of 1809. They were all negotiated partly at the *Union Bank,* and the whole afterwards at the *City Bank.* This is admitted in the answer. If a third mortgagee buys in the first mortgage, he can tack his third mortgage to the first, and come in, in preference to the second, for his debt due on the third. So where the first mortgagee lends money, or makes advances, looking to the mortgaged premises as security, he can tack the amount of the advances to his mortgage. *Pow. on Mortg.* 532 *Ex parte Hearn,* 1 *Buck on Bankruptcy,* 165.

The recitals in the deed from *T. Chase* to *R. M. Chase,* are evidence against the defendants of the existence of the deed from *S. Chase* to his sons, *S.* and *T. Chase.* When a mortgagor redeems the mortgaged premises he must pay the mortgage debt, and all advances. 1 *Eq. Ca. Ab.* (G) pl. 1.

*R. M. Chase* and *The Farmers' Bank* did not lend their money with a view to this property. *Cooper's Plead.* 281, 282. *Sugd.* 543, (and *notes,*) 393. *Berry vs. Mutual Insurance Company,* 2 *Johns. Ch. Rep.* 608. The right of tacking is to prevent a circuity of action.

3. *R. M. Chase* was bound to take notice of the deed of 1809, and he was therefore a purchaser with notice. Every thing calculated to put the party upon inquiry is notice. *Sugd.* 498, 542. The laws directing the recording of deeds were for the purpose of giving notice. *Mertins vs. Jolliffe, Ambl.* 313. *Taylor vs. Stibbert,* 2 *Ves. jr.* 440. *Jennings vs. Moore,* 2 *Vern.* 609. *Daniels vs. Davison,* 16 *Ves.* 249. *Frost vs. Beekman,* 1 *Johns. Ch. Rep.* 299. *Tucker vs. Woods,* 12 *Johns. Rep.* 190. *Billington's Lessee vs. Welsh,* 5 *Binney's*

*Rep.* 134.   *2 Fonbl.* 151.   A purchaser without notice cannot avail himself of it without relying upon it in his answer. *2 Madd. Ch.* 323.   *2 Eq. Ca. Ab.* 682, *(note* b.) . *Harris vs. Ingledew,* 3 *P. Wms.* 91.   *Moore vs. Mayhew,* 1 *Ca. in Chan.* 34.

The complainants are *recti in curia.*   When the bill was filed they had paid one note, and discounts upon others, to an amount of upwards of $5,000.   *Ranelaugh vs. Hays,* 1 *Vern.* 190.   *Lee vs. Rook, Mos.* 318; and *Norwood vs. Norwood,* 4 *Harr. & Johns.* 112.

The *City Bank* might have filed the bill, but as they did not, the complainants could do so.

<em>Curia adv. vult.</em>

STEPHEN, J. at this term delivered the opinion of the Court. [After stating the allegations in the bill, answers and plea, he proceeded as follows:]

In this case several important principles of equitable jurisprudence present themselves for the consideration and decision of this court.   Among them will be found the doctrine of tacking, as it is termed by the writers on chancery law, which gives a mortgagee or incumbrancer, under certain circumstances, the right, not only to have the debt, secured by a mortgage, satisfied out of the mortgaged property, but also other claims or demands which the mortgagee may have against the mortgagor, although the property mortgaged is in nowise made expressly responsible therefor.   To what extent this principle is to operate upon the rights of the parties now before this court, is a question of considerable interest and importance to them.   By the decree of the chancellor, from which they have appealed, the doctrine has been recognized as bearing upon this case, and applied in its fullest latitude.   And the duty now devolves upon this court of reviewing that decree, and of determining whether the extent, to which it has been carried, be justifiable upon authority, and the special circumstances of this case.

It is indisputably true, that the right of tacking is not founded upon contract or express stipulation, but has its foundation principally, if not exclusively, in the policy of the law, which is ever solicitous to prevent a multiplicity of suits, and avoid a

circuity of action. By the civil law, the mortgage is properly a security only for the debt itself for which it was given, and the consequences of it, as the principal sum and interest, and the costs and damages laid out in preserving it. But according to the equitable jurisprudence of the *English* law, the rule is, that he who will have equity to help him, where the law cannot, shall do equity to the party against whom he seeks to be relieved. 2 *Fonbl.* 272.

According to the principles which will govern the decision of this case, it is not indispensably necessary to decide upon the truth of the much controverted fact, whether *T. Chase* participate·l in the loans obtained from the *Union* and *City Banks* or not; as the result of this cause, according to the view which has been taken of it by this tribunal, will not essentially depend upon that fact. Even if he did so participate, can his moiety of the property mortgaged by his father to *N. G. Ridgely*, which was subsequently conveyed to him, and by him conveyed to *R. M. Chase*, be made responsible for more than the sum secured by the mortgage of the 21st of October 1809? That deed of mortgage was executed to *N. G. Ridgely* as an indemnity to him against any loss which he might sustain in consequence of his endorsements for his (the mortgagor's) two sons, *S.* and *T. Chase*, to an amount not exceeding the sum of $10,000. If *S. Chase*, the mortgagor, were now living, and this proceeding had been instituted against him to make the mortgaged property responsible to a larger amount than that stipulated by the deed, can it be believed that the attempt would eventually prove to be successful? As against a surety the contract cannot be carried beyond the strict letter of it. It cannot be extended by equitable construction. *Straton vs. Rastall,* 2 *T. R.* 370. In support of the same doctrine, that a surety is not liable beyond the letter of his engagement, see *Wright vs. Russell,* 3 *Wils. Rep.* 539. A surety, who becomes bound for the good conduct of a clerk to A, is not bound to him and a partner subsequently taken into partnership. In this last case the court say, courts of equity are favourable to sureties, for where they are not strictly bound at law, a court of equity will not bind them. That the undertaking of a surety shall be construed strictly—see also *Melville vs. Hayden,* 5 *Serg. & Lowb.*

3:9. By the express agreement of the parties, the mortgagor's liability was not to exceed the sum of $10,000; and *N. G. Ridgely* would have no right to look to the land, mortgaged as his security, for any responsibilities which he might incur over and beyond that amount. The rule *"expressum facit cessare tacitum,"* would be strictly applicable to such a case, and would effectually exclude any claim founded upon the principle of tacking.

If then *S. Chase,* the mortgagor, would not be responsible for more than the sum secured by his deed of indemnity, what is there in the case, which so peculiarly affects his assignees in point of equity, as to subject them to a greater liability? *S. Chase,* one of the defendants, it is true, by his deed of the 1st of February 1819, mortgaged his part of the wharf property conveyed to him by his father, and a part of a tract of land called *Elizabeth's Diligence,* to *M'Donald & Ridgely,* and *N. G. Ridgely,* to secure them for their endorsements on his behalf. So far then as respects him, the case is clear that he has made his property liable beyond the sum expressed in the original mortgage, by express contract. It is not necessary then to call in aid the principle of tacking to make his property answerable to the complainants for the extinguishment of their claim. The decree of the court below, therefore, as respects him, is perfectly correct, and consistent with the principles of law, equity and justice. But so far as it has reference to the case of *T. Chase,* it presents to this court a very different aspect. He has encumbered his property by no express contract or stipulation with the complainants, or either of them; and if it is to be charged at all with the payment of their demands, it must be by resorting to the doctrine of tacking, according to the principles which prevail in courts of equitable jurisdiction. Can his moiety of the property mortgaged by the deed of his father in 1809, to *N. G. Ridgely,* under the circumstances of this case, and according to those principles, be made responsible in the hands of *R. M. Chase,* his trustee, for a greater amount than the sum of $10,000, secured by that mortgage, with interest? In order to solve this question, and arrive at a just conclusion upon this part of the case, it is essentially important to ascertain whether or not *N. G. Ridgely,* or *M'Donald* and *Ridgely,*

when they endorsed the notes of *S. Chase* with *T. Chase*, looked to the land mortgaged by *S. Chase* in his lifetime to *N. G. Ridgely*, as a security or indemnity *to them*, beyond the amount specified in that mortgage? If they did not, it would seem to follow as a necessary consequence from the established principles of chancery jurisprudence, that the doctrine of tacking cannot be brought to bear upon their case. That they did not incur such responsibilities upon the immediate credit of the land mortgaged, it is only necessary to advert to some of the facts and circumstances proved in the cause. In a letter addressed by *M'Donald* and *Ridgely*, and written by *N. G. Ridgely*, to *S. Chase*, the writer, *(N. G. Ridgely,)* expressly states, that he had entirely forgotten that a mortgage had ever been executed to him by *S. Chase*, deceased, until he had been reminded of that fact by the letter of *S. Chase*, one of the defendants. In this letter are likewise the following strong expressions: "Indeed, so unbounded was our confidence, that we never had looked into the papers which you had given us as security, until the day we showed them to Mr. *Moale.*" In the same letter are also to be found the following expressions: "As the security now stands, the $10,000, endorsed by our *N. G. R.* is amply secured. The balance of $28,000 might have been amply secured, as the property would have sold two years ago; but as it may sell, (excluding *Tommy's* house as you propose,) 1, 2, 3 or 4 years hence, it may be very far short of ample security." Again, if they endorsed upon the credit of the property mortgaged by the deed of 1809, and considered that to be liable, why on the 1st of February 1819 take a mortgage from *S. Chase* of his moiety of the same property? And why, in the deed of the 1st of March 1820, agree to secure to *T. Chase*, in the first instance, $15,000 out of the proceeds of sale of his part of the wharf property, before any part thereof should be applied to the exoneration of *M'Donald* and *Ridgely*, or either of them, from their responsibilities? These circumstances are strongly indicative of the fact, that they never did rely upon or look to the land as the means of their indemnity, when the endorsements exceeded the sum of $10,000, secured by the original deed of mortgage.

In *Brace vs. Duchess of Marlborough*, 2 P. Wms. 491,

upon the subject of tacking, we find the law stated to be, if a judgment creditor buys in the first mortgage, he shall not tack or unite this to his judgment, and thereby gain a preference, because the judgment creditor does not lend his money upon the immediate view or contemplation of the real estate.   In the same case there is stated to be a difference in the law, where a third mortgagee buys in a statute which is the first incumbrance, and where a statute creditor, being the third incumbrance, buys in the first mortgage; in the latter case the statute or judgment creditor, because he did not lend his money on the credit of the land, shall not unite the first mortgage to his statute or judgment; but in the former, as the land was in the view and contemplation of the lender, he shall be allowed to unite the statute to his third mortgage.   If a first mortgagee lends a further sum to the mortgagor upon a statute or judgment, he shall retain against a mesne mortgagee till both the mortgage and statute or judgment be paid; because it is to be presumed that he lent his money upon the statute or judgment, as knowing he had hold of the land by the mortgage, and in confidence ventured a further sum on a security, which, though it past no present interest in the land, yet must be admitted to be a lien thereon. *Brace vs. Duchess of Marlborough*, 2 *P. Wms.* 493. *Shepherd vs. Tilley*, 2 *Atkyns*, 351.   But where a prior incumbrancer has a bond likewise, he cannot insist upon being paid both, which would be a prejudice to the puisne incumbrancer; but his bond shall be postponed to all other *incumbrancers*, whether by mortgage, judgment or statute staple, for he has not the same equity against a puisne incumbrancer, as against an heir at law, who is liable in respect of assets.   These cases are cited, and the principles therein referred to, for the purpose of showing, that one of the grounds upon which the doctrine of tacking materially rests, is that the party, when he advances his money, does it upon the credit of the real security, and looks to that for payment or reimbursement.   Instances or examples in further illustration of this principle, might be multiplied to a considerable extent; but the limits to which this opinion has already swelled, admonish me that it is time to draw to a conclusion.

But put the claim of the complainants upon the most favourable footing, and suppose the bill in this case to be filed by them

against *T. Chase,* as mortgagor, to foreclose the mortgage, can it be contended that they would have a right to tack their claims, to the prejudice of other creditors; that they would not, see *Lowthian vs. Hasel,* 3 *Brown's Chan. Rep.* 162, where Lord Chancellor *Thurlow* said, "the only reason why the mortgagee can tack his bond to his mortgage is to prevent a circuity of suits; it is solely matter of arrangement for that purpose, for in natural justice the right has no foundation. The principle explains the rule; and therefore it can go no further; the creditor having another specific security, cannot give him, in justice, any priority. There being no foundation in justice, the only question is, whether the court is in the practice of doing it; and it has not done it in any case but that of the heir at law, and merely to prevent circuity." So also in *Hamerton vs. Rogers,* 1 *Ves.* jr. 513, a bill of foreclosure was dismissed, with costs, so far as it sought to tack a bond to a mortgage against creditors. The principle was considered to be too clear to admit of argument.

But is the right of tacking admissible in this case upon another ground? In 1 *Madd. Chan.* 525, the principle is stated to be, that a distinction prevails between a bill to redeem, and a bill to foreclose; for in the latter case the mortgagee cannot insist on tacking his subsequent debt, as he may do on a bill for a redemption. See also the *Note* to *Coleman vs. Winch,* 1 *P. Wms.* 776. The rule in the latter case is, that he who seeks equity must do equity; for he who will have equity to help him, where the law cannot, shall do equity to the party against whom he seeks to be relieved. 2 *Fonbl.* 272.

The only remaining point relied upon in the discussion of this cause, which it is proper to consider and decide, is the plea in bar founded upon the deed of the 1st of March 1820. In the case of *Thompson vs. M'Kim,* 6 *Harr. & Johns.* 332, this court have said, "the constitution and principles of the court of chancery in this state, as in *New York,* originally emanated from the court of chancery in *England,* from which source we derive our principal stock of information in chancery jurisprudence; and the general rules governing the court of chancery there, so far as they are applicable, have been adopted here, and are constantly practised upon." Pleas are a species

of defence in equity, not so frequently relied upon in this state as in *England;* but when resorted to by a defendant, the rules which have been adopted in that country, in relation to them, must be considered as applicable here.    In *Mitford's Plead.* 15, he says, "a plea is also intended to prevent further proceeding at large, by resting on some point founded on matter stated in the plea; and as it rests on that point merely, it admits, for the purposes of the plea, the truth of the facts contained in the bill, so far as they are not controverted by facts stated in the plea.    Upon the sufficiency of this defence the court will also give immediate judgment, supposing the facts stated in it to be true; but the judgment, if favourable to the defendant, is not definitive; for the truth of the plea may be denied by the plaintiff by a replication, and the parties may then proceed to examine witnesses, the one to prove and the other to disprove the facts stated in the plea." 2 *Madd. Chan.* 295.    Although the books say, that where a plea is set down for argument, the facts stated in it are admitted to be true, (*Mitford* 198,) yet such admission is not conclusive upon the plaintiff, but is presumed to be made for the purpose of testing the validity of the plea in point of law, founded upon such facts, supposing them to be true.    If the plaintiff replies, and takes issue upon the facts of the plea, he admits its legal sufficiency; and if the facts are found to be true, the complainants' bill must be dismissed, with costs.    *Mitford,* 241. 2 *Madd. ch.* 295.    In this case the plea was not set down for hearing, and consequently no judgment of the court was had upon its sufficiency; nor does it appear that any replication was ever filed, by which its sufficiency would be admitted.    If in *England* the defendant does not set down his plea to be argued within eight days after it is filed, it is considered as abandoned, and the plaintiff is entitled to costs.    2 *Madd. Chan.* 295. *Jordan vs. Sawkins*, 3 *Bro. Chan. Rep.* 372.    But in adverting to the rule established in this case, it is not intended to adopt it as applicable to the practice of the court of chancery in this state.

From these principles, and the authorities cited in support of them, it follows, as a necessary consequence, that the plea filed in this case did not operate to bar the plaintiffs' suit.—DECREED, That the decree of the court of chancery, except as hereinafter

excepted, be reversed, with costs to the appellants by them incurred in this court. *Decreed* also, that there is now due to the appellees, the sum ascertained to be due by the said decree, together with legal interest thereon from the date of the said decree; and that for $10,000, a part of the said sum, together with legal interest upon the said $10,000 from the 29th of August 1819, the whole of the property and estate mentioned and contained in the deed of mortgage from *Samuel Chase*, deceased, to *Nicholas G. Ridgely*, one of the appellees, of the 21st of October 1809, is first responsible and bound for; and that for the balance of the said sum, with interest as aforesaid, the moiety of the said property and estate in the said deed of mortgage of 1809, which belonged to, and was the right of *Samuel Chase*, one of the appellants, as also all the property to which the said *Samuel Chase* was entitled, and by him conveyed to the appellees, by his deed of the 1st of February 1819, except such parts of the said last mentioned property as is contained in another deed from the said *Samuel Chase* to *Richard M. Chase*, one of the appellants, of the 30th of August 1817, is also first responsible and bound for. *Decreed* also, that the chancellor pass all and every such order and decree in the premises as may be necessary to carry into effect the present decree; and that nothing herein contained shall be held or construed to affect, or in any way impair, any right which any purchaser or purchasers may have acquired to any part of the property decreed to be sold by the decree of the court of chancery in this case, under any sale or sales which may have been made of such property under or by virtue of the said decree, and under the authority of the said court of chancery; but that any such right shall be, and is hereby decreed to be, as good and valid as the same would have been, in case the said decree of the court of chancery had been in all things well and truly affirmed by the present decree of this court, or as it would have been if the said decree had not been appealed from. Nor shall the present decree be construed to affect, or in any way impair, any distribution of the proceeds of any such sale or sales, which may have been made in the court of chancery, and which may not be inconsistent with the provisions of the present decree.

DECREE REVERSED, &c.